UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MYRMA SANTIAGO,

                    Plaintiff,

          - against -                                    **MEMORANDUM & ORDER**
                                                         05-CV-3668 (RRM) (VVP)

THE CITY OF NEW YORK, FRANK
SQUILLANTE, EDWIN KNIGHT, RALEEM
MOSES and ANTHONY MARGELLO, in their
official and individual capacities,

                    Defendants.
------------------------------------------------------------X
MAUSKOPF, United States District Judge.

          Plaintiff Myrma Santiago, a female Hispanic of Puerto Rican descent, brings this suit

pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, New York State Executive Law,

Human Rights Law §§ 290 *et seq.*, and New York City Administrative Law Title 8, against the

City of New York (the "City"), and against Warden Frank Squillante, Deputy Warden Edwin

Knight, Captain Raleem Moses, and Correction Officer Anthony Morgello,[1] in their individual

capacities and in their official capacities as employees of the New York City Department of

Correction ("DOC"). Before the Court is defendants' motion for summary judgment on

plaintiff's § 1983 claims.[2] For the reasons stated below, defendants' motion is GRANTED and

the complaint is DISMISSED in its entirety.

---

[1] Defendants report that the correct spelling of this defendant's last name is Morgello, not Margello. (Defs.' Am. L. R. 56.1 Statement (Docket No. 28) ("Defs.' L.R. 56.1") at 1 n.1.)

[2] Plaintiff's Opposition (Docket No. 32) erroneously states that, in addition to plaintiff's § 1983 claims, the Complaint alleged causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff has not raised Title VII or § 1981 claims in this action before, and she may not do for the first time in opposition to summary judgment. *See Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, 407–08 (S.D.N.Y. 2000).

## FACTS[3]

Beginning February 18, 11988, plaintiff Santiago was employed as a Correction Officer ("CO") in the DOC assigned to the Eric M. Taylor Center ("EMTC") at Rikers Island. During the ten-year period from 1993 through 2003, plaintiff was appointed to the infirmary post at EMTC, working a daily 3 p.m. to 11 p.m. schedule.[4] Unfortunately, in 2003, plaintiff was injured in an automobile accident. When she returned to work, plaintiff was placed on "medically monitored" status, which limited her ability resume her full duties at the EMTC infirmary. As a result, she was reassigned to light duty in the EMTC personnel department for approximately six months with a 5 a.m. to 1 p.m. work schedule. Following her assignment to Personnel until the filing of this action, plaintiff occupied various posts on the same 5 a.m. to 1 p.m. schedule.

After leaving Personnel, plaintiff complains that she repeatedly applied for permanent assignment to numerous alternative posts throughout the EMTC. Despite her various attempts to secure a permanent post, however, it is uncontroverted that she was repeatedly denied reassignment, securing, at best, only temporary work. It is plaintiff's contention that she was

---

[3] The following facts are drawn from (i) the Complaint (Docket No. 1), (ii) defendants' Amended Local Rule 56.1 Statement (Docket No. 28), (iii) the exhibits referenced therein and annexed to the Declaration in Support of Defendants' Motion for Summary Judgment (Docket No. 30) ("Chiu Decl."), and (iv) plaintiff's Counter-Statement Pursuant to Local Rule 56.1 (Docket No. 31) ("Pl.'s L.R. 56.1"). Additionally, the Court reviewed the facts set forth in Plaintiff's Opposition, even though these facts should either have been set forth in a separate Local Rule 56.1 Statement with numbered paragraphs and citations to the record or included in plaintiff's Counter-Statement. *See* L.R. 56.1(b), (d). Plaintiff did provide citations to the record in her statement of facts.

[4] At some point in the following years she was taken off that post, but kept her steady schedule, serving miscellaneous duty at various posts around the EMTC.

denied and/or removed from various posts because of race and/or gender discrimination and/or as retaliation for her role as one of the EMTC's equal employment opportunity ("EEO") counselors, a role in which she assisted EMTC employees with complaints related to unlawful harassment and discrimination in the workplace.

In addition to claims that she was not considered for permanent employment posts, plaintiff claims that she was discriminatorily denied promotion to captain. In 2001, plaintiff passed a Civil Service Examination, making her eligible for such promotion, and, based on her score on that examination, was ranked as either #239 or #329 on the list of eligible candidates.[5] According to plaintiff, she was approved to attend the academy for captain's training by four different wardens over the next two years but was not called up to the academy until July 2003.[6] When called up, plaintiff was on vacation in Florida. She alleges that defendants knew this, and called her up in the hopes that she would not be able to attend the training. Finally, plaintiff claims that she was denied yearly recertification training required of all officers, and that she was discriminatorily denied required lunch breaks and/or denied corresponding compensatory time to which she was entitled. As stated above, the motivation for each of these adverse actions is alleged to be race, gender bias, and/or in retaliation against her general EEO activities.[7]

---

[5] In her testimony, plaintiff could not recall her exact list number, and defendants offered no elucidating evidence.

[6] No explanation is offered as to why plaintiff was approved on multiple occasions for captain's training but not called to the academy until July 2003.

[7] In 2000, Santiago began serving as an equal employment opportunity ("EEO") counselor. In this role, Santiago counseled DOC employees regarding their EEO concerns. She did not receive a salary or other economic benefit for performing these duties.

3

## A.    Evidence of discrimination

In support of claims for disparate treatment, hostile work environment and retaliation, plaintiff claims that she became aware of pervasive hostility toward her from DOC supervisors, which environment manifested itself as consistent obstruction to her DOC career advancement. For example, she alleges that she was dissuaded from formally applying for a post in EMTC's security department, because co-workers told her that DOC supervisors in that department "did not like her," and were "afraid" of being "written up" by her on EEO related charges. As corroborating evidence, plaintiff claims that another CO allegedly conveyed his understanding that her EEO role was the source of her difficulty in obtaining a permanent post. That co-worker is alleged to have said, "I don't know why you ever took the EEO position . . . because I feel this is where all your problems are coming from, they feel that you're a trouble maker, a whistleblower." Similarly, plaintiff testified that she was told, by another, black male, co-worker, that she "has the 'white boys' running scared" and that "the 'white boys' said words to the effect of, 'watch out for Santiago because she is an EEO officer and she will make trouble.'"

Plaintiff's EEO role is also cited as the motivation behind her removal from those assignments she actually did obtain, including a certain EMTC security-related post. Although the record is devoid of specifics concerning the nature of that assignment, the dates she occupied that position, or when she was removed, she claims that in connection with her removal, Captain Cruz, a male captain at EMTC, told her that the motivation for that action was because defendant

4

CO Morgello (who was not a supervisor, but rather her EMTC co-worker) had objected to her presence in the security department, on grounds that she was associated with Captain Gail Lewis, a DOC employee that had previously filed a discrimination suit against certain DOC officials, including Warden Squillante and Deputy Warden Knight, both of whom are named defendants in this action. Although Morgello's alleged statements were relayed to plaintiff second-hand, he is alleged to have said, "why are you letting Santiago in the Security office, she is the one with Captain [Gail] Lewis making all these lawsuits." Ultimately, plaintiff alleges that Morgello "influenced" Warden Squillante to remove her from the security post and to further deny her appointment to other permanent posts, as well as access to certain career training, because of discriminatory and retaliatory motives. As further direct evidence of Morgello's animus, plaintiff claims that certain of her co-workers overheard Morgello go so far as to say not only that he "did not want her around," but, in a tirade, once "threatened to do 'crazy Mafia shit' to [her]." The circumstances of that latter event were allegedly relayed to plaintiff by yet another co-worker, although plaintiff provides no independent corroborating evidence that that incident actually took place. Finally, as to Morgello's ability to transform his discriminatory hostility into employment action, plaintiff claims that Morgello was heard to brag that he "had [Warden] Squillante wrapped around his finger." Notably, none of these statements allegedly made by Morgello were actually witnessed by plaintiff—rather, she heard about them from co-workers who supposedly had heard them when made.

5

With respect to defendant Squillante, a warden with supervisor responsibility, plaintiff alleges that she was removed from or denied numerous employment opportunities by him without legitimate reason, including desired assignments at the inmate work farm, a so-called "paint post," security post, and a position described only as the "GO/movement" post. Each of these desired assignments were instead given to employees who were not women, or not black or who played no "whistle-blowing role" as an EEO counselor.

In each of these instances, plaintiff alleges that she had more seniority and/or was more qualified than the officers ultimately assigned. In every instance, she alleges a pretextual basis for her rejection or removal. For example, she alleges that she was denied one post, the commissary post, on a pretext that she did not possess a commercial driver license ("CDL"), despite the fact that officers ultimately assigned to that post either similarly lacked CDLs or were afforded time to obtain them. Plaintiff also alleges that some posts were filled in contravention of DOC's express employment policies, as set forth in DOC Operations Order 14/91. Specifically, she claims that deviations from DOC's employment policy were done in a manner that discriminated against her in favor of others. In this regard, she brings claims against another DOC supervisor, Deputy Warden Knight, whom plaintiff describes as a black Caribbean male, and whom she alleges discriminatorily favored other black Caribbean applicants.[8]

In general, plaintiff alleges that she was denied other unspecified posts, citing the reluctance of certain other unnamed DOC employees to work with her because of her race and

[8] While plaintiff, as a Puerto Rican, is of Caribbean descent, she is Hispanic, not black.

6

gender and/or because of her activities as an EEO counselor. In one rare example of specific allegations, plaintiff alleges that defendant Captain Moses, a higher-ranking female than plaintiff, told Squillante not to assign plaintiff to the EHO post, encompassing the sanitation, commissary, and paint details, because she [Moses] preferred to work with men.[9]

In addition to alleging that she was denied various posts for which she applied, plaintiff also alleges that she was discriminatorily denied yearly recertification training required of all officers despite appropriately notifying her superiors that she was due for such training. Plaintiff alleges that among the training she was denied was handgun recertification, without which she was ineligible for assignment to certain posts. Finally, plaintiff alleges that she was discriminatorily denied meal relief and/or the corresponding compensatory time to which she was entitled. Plaintiff claims that she put in for numerous instances of compensatory time on days when she had been denied a lunch break, but that her requests were never responded to.

In January and December of 2004, plaintiff submitted letters to the DOC's internal EEO office, making various complaints about her inability to obtain desired postings and other matters. In October 2004, plaintiff submitted a formal complaint to that office, complaining that

[9] Notably, plaintiff alleges no personal knowledge of this statement, but instead claims that it was conveyed to her by Squillante.

7

Captain Moses had retaliated and/or racially discriminated against her by denying her a post in the EHO area.[10] The internal EEO office found all of these complaints to be unfounded.

Notwithstanding the DOC EEO's finding that plaintiff's complaints of discrimination were unfounded, plaintiff on August 3, 2005 commenced the instant action, alleging that defendants had subjected her to a hostile work environment, discriminated against her on the basis of her gender, race, color and national origin, and retaliated against her for serving as an EEO counselor and/or for filing an EEO complaint in 2004.

*B.    DOC's evidence of nondiscriminatory action*

Defendants argue that plaintiff's allegations of unlawful discrimination are without merit. It is DOC's position that plaintiff's failure to obtain a permanent assignment prior to filing this action or to obtain promotion to captain prior to July 2003 was based on a host of nondiscriminatory factors, not least of which were her longstanding record of absenteeism and tardiness. DOC explains that plaintiff's consistently poor performance with respect to attendance was a permissible, nondiscriminatory factor in the denial of any particular employment assignment, as expressly permitted under DOC Operations Order 14/91, which requires the Warden—the final decisionmaker on EMTC employment decisions—to consider in awarding assignments an employee's: (1) seniority, (2) work performance, (3) *attendance record*, and (4) special skills.

---

[10] Plaintiff claimed that she was denied a post in the EHO because Captain Moses "didn't like [her]." Plaintiff does not offer any concrete explanation why Moses might not like her, but instead offers only speculation: "I can not [sic] tell you if she doesn't like me because I am a Puerto Rican woman or because I am the EEO Officer."

In this case, DOC argues that plaintiff's attendance record was more than sufficient to render her unsuitable for any number of permanent DOC postings. Indeed, the summary judgment record indicates that during plaintiff's initial eighteen-month probationary employment period, she was cited for poor attendance and punctuality, resulting in the extension of her probationary period by six months. And, although she was not terminated, the record demonstrates that during her third probationary performance evaluation, plaintiff's record actually included a termination recommendation, which cited her poor attendance record.[11]

During the period from October 1, 1994 to September 16, 1995, plaintiff was absent for 178 days, and was designated as "Chronic Absent-Category B," an apparently adverse designation, which she appealed.[12] That appeal was denied by her ultimate supervisor at the time, Warden David Kalos. Kalos, against whom no allegation of discriminatory conduct is asserted, expressly noted that plaintiff had then been absent for 429 days during her eight-year tenure with the DOC, averaging fifty-four days absent per year.[13] From the record it appears that, between October 1995 and October 2002, plaintiff was counseled three times regarding her attendance, and was marked absent on at least twenty-six separate occasions.

---

[11] Plaintiff explains that her attendance problems in this time period were due to her catching the measles from an inmate.

[12] The parties do not provide any explanation of DOC terminology.

[13] Plaintiff explains that she had been in car accidents in both 1994 and 1995 that caused her to be absent from duty.

In October 2002, plaintiff was again designated as "Chronic Absent," in part due to a twenty-nine day absence in August and September 2002.[14] Yet again, in April 2005 (due to eleven days absent) and December 2005 (due to eleven days absent), she received attendance counseling. At that time, plaintiff was expressly warned that DOC suspected malingering conduct, and noted that her use of "sick days" was suspiciously correlated with such things as holidays and personal time:

> Records indicated that [plaintiff's] sick days are connected with . . . personal emergencies, pass days, time due, vacation and holidays – Memorial Day & Thanksgiving. [Plaintiff] has been advised that a pattern of sick abuse may result in the loss of one (1) or more discretionary benefits.

Thus, it appears that plaintiff was documented claiming sick days for reasons other than illness, in violation of DOC policy.

Plaintiff's attendance problems aside, DOC states that plaintiff's movement between assignments was not unusual and is not a proper basis from which to infer a discriminatory motive. All newly appointed CO's are "on the wheel," meaning that they rotate through various tours on a rotating schedule, four days on one schedule, followed by two days off, followed by four days on another schedule, etc. Moreover, CO's may be temporarily assigned, for example to cover for the vacation or illness of another officer. In fact, DOC claims that this was the case here with respect to a number of plaintiff's postings, each of which DOC contends were well-known to be temporary, substituting work assignments. Further, defendants note that, contrary to

---

[14] Plaintiff again attributes this absence to a car accident.

10

plaintiff's claim that between 2003 and 2005 she was unable to achieve postings on her desired 5 a.m. to 1 p.m. schedule, she did, in fact, obtain a variety of posts that fit that bill, resulting in plaintiff maintaining this schedule throughout the time in question.

DOC argues that plaintiff's failure-to-promote claims are similarly unavailing. DOC adduces evidence that plaintiff was afforded an opportunity for promotion to captain, which she chose to decline. The uncontroverted record indicates that on or about July 9, 2003, plaintiff sent a letter to a warden at the academy, expressly declining the invitation because, in her words, doing so would not "benefit me or my family at this stage of our lives."[15]

Plaintiff's decision to decline the DOC's promotional opportunity, notwithstanding, DOC claims that the events and circumstances pertaining to plaintiff's failure-to-promote claims precede any alleged instance of racial discrimination by DOC supervisors or co-workers. Notably, plaintiff's discrimination allegations almost exclusively concern the time period *after* defendant Squillante became Warden of the EMTC; *i.e.*, June 2003. (*See* Pl.'s Mem. L. Opp'n Defs.' Mot. Summ. J. (Docket No. 32) ("Pl.'s Opp'n") at 3 ("Plaintiff observed an increase in racism after Squillante arrived. . . . Prior to Squillante's appointment, Plaintiff had been denied posts she had applied for, but procedure was always followed in doing so.").) Yet, plaintiff alleges that she was passed over for captain's training three or four times between 2001 and 2003—a timeframe well prior to Squillante's tenure as Warden. The only overlap in this timing

---

[15] Plaintiff alleges that she sent this letter on the instruction of a Captain Times, and that she would have accepted the invitation if she had been called earlier, "when she was supposed to be called," but that she did not want to accept it at this later date, in part because she would have to go back "on the wheel" as a new captain.

is with respect to plaintiff's letter declining DOC's officer to attend captain's training, sent in July 2003, only one month after Squillante's became EMTC's warden.

With respect to plaintiff's claims regarding meal relief and compensatory time, defendants identify more than twenty-six instances in 2004 and 2005 on which plaintiff was, in fact, compensated for missing meals.

Lastly, DOC argues that plaintiff's claims of retaliation are belied by the record in that, *after* filing this lawsuit, plaintiff, in late December 2005, was awarded a permanent post in the EMTC commissary.

## **DISCUSSION**

### **I.    Summary judgment standard**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there "is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 322.

12

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Furthermore, the nonmovant "cannot rely on inadmissible hearsay in opposing a motion for summary judgment," *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).

However, "all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). But where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to

13

[its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## II.      Disparate treatment claim

Discrimination claims brought under 42 U.S.C. § 1983, and the New York State and New York City Human Rights Law proceed under the same analytical framework applicable to Title VII claims. *See, e.g.*, *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008). Claims of disparate treatment in employment are analyzed according to the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* "burden-shifting" inquiry, in the absence of direct evidence of employment discrimination, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position applied for; (3) she was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). This burden is minimal and does not require specific evidence of discrimination. *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). If a plaintiff meets this burden, the defendant employer must then articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at

14

802. To prevail, a plaintiff must then provide evidence that the employer's explanation is not true, but is instead only a pretext for discrimination. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

The ultimate burden to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981). It is not enough for a plaintiff merely to create doubt that the defendant's stated reason was the real reason for discharging her. She must also put forth "evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination" on the basis of her race. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997).

The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130 (2d. Cir. 2008) (citations omitted). District courts must remain mindful that, when an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). However, while courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that

15

summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). And, although district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, see *Gallo*, 22 F.3d at 1224, courts are not to "'treat discrimination differently from other ultimate questions of fact,'" *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Thus, although it is difficult for courts to ascertain discriminatory intent, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999). Even in discrimination cases, therefore, a plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment, *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), as "[s]ummary judgment remains available for the dismissal of claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

Plaintiff cites a number of adverse employment actions allegedly suffered on account of her race, color, gender, national origin, and her position as an EEO counselor:[16]  (1) failure to promote; (2) failure to train; (3) discriminatory denial of and removal from certain post

[16] Plaintiff provides no authority for her assertion that her status as an EEO counselor qualifies as placing her in a protected class. Title VII is limited in its applicability to "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The New York State and New York City Human Rights Laws similarly do not encompass status as an EEO counselor as a protected class. *See* N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code §8-107(1)(a). Because this Court dismisses all of plaintiff's claims on other grounds, it is not necessary to examine further her arguments in this regard.

16

assignments; and (4) discriminatory failure to award compensatory time. Each claim is addressed in turn.

### A. Failure to promote

Plaintiff alleges that defendants held up her promotion to captain while permitting other, lower-ranked candidates to bypass her on the promotion ladder. Even though defendants concede for the purposes of this summary judgment motion that plaintiff "is a member of a protected class, is qualified for the promotion to Captain and posts she applied for, and that the failure to promote plaintiff to Captain is an adverse employment action," (Defs.' Mem. L. Supp. Mot. Summ. J. (Docket No. 29) ("Defs.' Mem.") at 4 n.3), they contend that plaintiff has failed to offer anything more than conclusory allegations that she was denied promotion to captain until July 2003 under circumstances giving rise to an inference of discrimination. This Court agrees.

Plaintiff recognizes that four different wardens (presumably including Warden Squillante) approved her for promotion, and has offered no facts to explain why she was not called to captain's training before July 2003. Instead, she offers only speculation and conclusory allegations that this delay was due to discrimination. Furthermore, plaintiff offers no admissible evidence that others not in her protected class were promoted ahead of her, see *Abdu Brinson*, 239 F.3d at 468 (evidence that similarly situated employees are treated differently can support inference of discrimination), or that the length of time that passed before she was called to captain's training was in any way unusual, see *Bucknell v. Refined Sugars, Inc.*, 82 F. Supp. 2d 151, 158 (S.D.N.Y. 2000) (failure to follow regular procedures can be evidence of pretext).

17

Even if, taking plaintiff's allegations in the most favorable light, this Court held that plaintiff had established a *prima facie* case of disparate treatment, defendants have articulated a legitimate, nondiscriminatory reason for the delay—namely that many other candidates were ahead of plaintiff in line for captain training given their higher scores on the civil service exam. Plaintiff has offered nothing more than speculation and conclusory allegations in support of her position that defendant's explanation is merely a pretext for discrimination. In fact, as noted above, plaintiff does not even *allege* discriminatory conduct until the beginning of Warden Squillante's tenure at the EMTC, approximately coincident with the July 2003 invitation to captain's training, and subsequent to the period where plaintiff was allegedly not promoted for discriminatory reasons. Accordingly, this claim must be dismissed.

### B.    Failure to train

Plaintiff alleges that she was discriminatorily denied annual recertification training, which also affected her eligibility for certain sought-after posts. Firstly, plaintiff has not established that the failure to train her was an adverse employment action. *See, e.g.*, *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. Nov. 9, 2006) ("When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action."); *Youssef v. Jam. Hosp. Med. Ctr.*, No. 04-CV-3389, 2006 U.S. Dist. LEXIS 80672, at *10 (E.D.N.Y. Nov. 5, 2006) (finding no adverse employment action where plaintiff failed to demonstrate that his lack of training caused him to be denied advancement or job opportunities). Secondly, plaintiff fails

to identify any specific training opportunities that she was denied, or to provide any concrete evidence from which a jury could infer discriminatory intent in denying her training. Her allegations in the Complaint are purely conclusory and provide no detail; similarly, plaintiff's opposition and her deposition testimony establish only that she notified her supervisors of her need for training and never heard a response. While this may establish a violation of procedure, or good practice, it is insufficient to support an inference that plaintiff was denied training on account of her race, gender, color, national origin, or status as an EEO counselor. Plaintiff also fails to offer any evidence that others at the EMTC were treated differently with respect to training. For these reasons, this claim, too, is dismissed.

### C. Discriminatory denial of and removal from certain post assignments

Plaintiff alleges that she was both denied assignment to and removed from certain desired post assignments because of her work as an EEO counselor and because of her membership in protected classes. First, plaintiff has not shown that these actions were "adverse employment actions" sufficient to establish a claim under the relevant statutes. An adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,

19

or other indices . . . unique to a particular situation." *Id.*; *see also Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).

Here, none of the posts plaintiff sought would have resulted in an increase in wage, salary, or benefits, a change in title, or significantly increased material responsibilities; notably, while plaintiff argues that some posts offered more interesting work than others, this is insufficient to establish that the denial of those posts rose to the level of an adverse employment action. Plaintiff also conceded that throughout the entire period at issue she was working the same schedule, 5 a.m. to 1 p.m., that she requested. Furthermore, defendants submitted unrebutted evidence that many of the posts from which plaintiff was allegedly removed were known to plaintiff to be temporary. And, plaintiff's argument that she had been "promised" many of these posts is premised on nothing more than self-serving testimony as to what Warden Squillante had allegedly told her, in what would have been a clear violation of Operations Order 14/91—the same Order that plaintiff claims was violated in denying her posts for which she had applied.

Even assuming for the sake of this motion that these actions are adverse employment actions, plaintiff's claim nevertheless fails because she has not established that these decisions were made under circumstances giving rise to an inference of discrimination. Plaintiff offers nothing more than speculation, hearsay, and conclusory allegations as support for her claims that defendants were motivated by discriminatory intent. Her belief that she was discriminated against is based purely on hearsay, often several degrees removed from plaintiff, and her

20

unfounded speculation and conjecture that, since she was otherwise qualified (in her own opinion) for these positions, the only possible reason she would not have been awarded them was because defendants were discriminating against her. This is insufficient to establish an inference of discrimination. *See, e.g., Bickerstaff*, 196 F.3d at 448; *Meiri*, 759 F.2d at 997–98 ("[T]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

Plaintiff's only admissible evidence shows nothing more than that individuals outside of plaintiff's protected class were awarded the posts she wanted. Such a showing is insufficient to support a claim. *See, e.g., Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 743–43 (S.D.N.Y. 2005) (mere fact that defendant hired employees who were younger than plaintiff insufficient to establish genuine issue for trial). Plaintiff fails to show that any of these individuals were similarly situated to her in seniority, experience, and special skills for the positions at issue, therefore robbing these facts of the significance they might have had. *See, e.g., Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (holding that, to raise an inference of discrimination, plaintiff must "show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself"). Moreover, as discussed previously and below, plaintiff's history of absences and attendance counseling makes her not similarly situated to other CO's with similar records and tenure but without a history of absenteeism.

Without weighing defendants' evidence, this Court recognizes that, even if plaintiff established an inference of discrimination adequate to support a *prima facie* case, defendants have come forward with evidence that there were legitimate, nondiscriminatory reasons for these actions. For example, with respect to both the farm post and the paint post, plaintiff was assigned to those posts as vacation relief to cover for CO's who were taking their annual leave; her "removal" from those posts was therefore the contemplated end of a temporary duty assignment. Similarly, for the personnel post and the GO/movement post, plaintiff was less senior than the successful CO applicants. For the main clinic post, while plaintiff was admittedly the most senior CO to apply, the record shows that she was denied the post because of her record of lengthy and frequent absences. In fact, plaintiff's history of attendance counseling and frequent absence provides a legitimate, nondiscriminatory reason for the denial of each post for which she applied, and she has offered no admissible evidence showing that this reason (or any of the others offered) was merely a pretext for discrimination.[17] *See, e.g., Bickerstaff*, 196 F.3d at 456 (noting that plaintiff's "'[feelings and perceptions] of being discriminated against [are] not evidence' of discrimination") (quoting *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1439 (2d Cir. 1995)).

---

[17] This Court notes that the statements and motives that plaintiff attributes to defendants are without proper evidentiary support, and are based either on hearsay or, even worse, mere speculation and conjecture. While plaintiffs in discrimination cases are entitled to some leeway in proving their case, especially when demonstrating state of mind on the part of defendants, it is axiomatic that such plaintiffs must still provide "evidence that allows for a reasonable inference of discrimination [and not only] evidence that gives rise to mere speculation and conjecture." *Bickerstaff*, 196 F.3d at 448.

Her claims of discrimination with respect to assignment to and removal from various assignments are therefore dismissed.[18]

### D. Discriminatory failure to award compensatory time

Plaintiff also alleges that she was denied meal relief or compensatory time for discriminatory reasons. Plaintiff has offered no evidence in support of this allegation. Defendants, on the other hand, submit record evidence showing that plaintiff received compensatory time on at least twenty-six instances between January 2004 and April 2005. Notably, plaintiff testified at her deposition that she was not even sure that she had been denied compensatory time, because she claims she never received a written answer to her requests for such time. She offers, however, no evidence of a particular instance when she requested compensatory time and it was denied to her. In contrast, defendants have submitted unrebutted evidence that plaintiff was awarded appropriate compensatory time on numerous occasions. As plaintiff has failed to show she was entitled to any compensatory time, let alone that any denial was as a result of discrimination, her claim must be dismissed.

---

[18] Plaintiff also argues that she was at first denied the commissary post to which she was eventually assigned on the pretext that she lacked a commercial driver's license ("CDL"), and that other CO's assigned to that area were not required to have CDL's or were allowed to obtain them after assignment. As an initial matter, it is unclear from the evidence whether the other officers assigned to the commissary were performing the same tasks as the post plaintiff had applied for. More importantly, however, plaintiff offers no evidence in support of her assertion as to why she was denied the post, or that any reason proffered by defendants was a mere pretext for discrimination. That plaintiff was eventually assigned to the commissary after filing this action is not sufficient evidence that the earlier denial of assignment was discriminatory, and this Court will not second-guess DOC's decision. *See, e.g., Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (stating that federal courts should not become "court[s] of personnel appeals" that second guess employer's business judgments (citing *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)).

## III.    Retaliation claim

Here, plaintiff claims actionable retaliation under the New York State and New York City Human Rights Law, which are analyzed under the same analytical framework as Title VII claims.[19] *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 609 (2d Cir. 2006).  The elements of a claim of retaliation under Title VII are: (1) that a plaintiff engaged in protected activity under Title VII; (2) that the employer was aware of the protected activity, (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006).  Plaintiff claims that she was retaliated against because she submitted several complaints to the DOC's internal EEO office, and also because she complained informally to Warden Squillante about her inability to obtain desired posts and her feeling that this was due to discrimination against her.[20]

---

[19] While plaintiff's Complaint purports to assert a claim under the First Amendment, which could be grounds for a viable claim of retaliation under § 1983, defendants assert, and plaintiff apparently concedes, that the reference in her complaint to the First Amendment was a typographical error.  Furthermore, plaintiff does not argue any claim under the First Amendment in her opposition.  To the extent plaintiff did intend to pursue such a claim, it is hereby deemed abandoned and so dismissed. *See, e.g., Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases)).

[20] Plaintiff's Complaint can be read to assert claims of retaliation based purely on her status as an EEO counselor, and defendants addressed this claim in their moving papers; in opposition, however, plaintiff did not pursue this argument, instead relying solely on certain specific complaints she made to Warden Squillante and the EEO office as grounds for her claim of retaliation.  Because plaintiff has abandoned this line of argument, this Court will not address the issue of whether plaintiff's status as an EEO counselor, with nothing more, would be sufficient to support a claim of retaliation. *See Taylor*, 269 F. Supp. 2d at 75.

Claims of retaliation under Title VII are evaluated using a burden-shifting analysis similar to that employed in determining claims of disparate impact. *Davis v. SUNY*, 802 F.2d 638, 642 (2d Cir.1986). Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, *id.* at 642, and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge. *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 116 n.8 (2d Cir. 1987). These allocations of burdens of production and proof in retaliatory discharge cases are not meant to be "rigid, mechanistic, or ritualistic. The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against the plaintiff for engaging in protected activity." *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984); *U.S. Postal Serv. v. Aikens,* 460 U.S. 711 (1983); *see generally Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Plaintiff relies on several written complaints made to the DOC's EEO office in 2004[21] to establish that she engaged in protected activity, as well as various oral complaints allegedly made directly to Warden Squillante. Notably, plaintiff fails to provide any concrete particulars

---

[21] Plaintiff's opposition states that she filed a complaint with the EEO office in 2003 and twice in 2004, but the record evidence, including the deposition testimony to which plaintiff cites, establish that her complaints to the EEO office were all in 2004 (January, October, and December), and not in 2003. (*Compare* Pl.'s Opp'n (Docket No. 32) at 16, *with* Santiago Dep. Tr. (attached as Ex. A to Decl. of Thomas Ricotta (Docket No. 33)) at 146–48; *see also* EEO Compl. (attached as Ex. U to Chiu Decl. (Docket No. 30)); Jan. 23, 2004 and Dec. 7, 2004 Letters from Santiago to EEO Office (attached as Ex. B. to Supp. Chiu Decl. (Docket No. 34)).)

regarding the alleged complaints she made to Squillante,[22] making it impossible for this Court to evaluate any claims based on these complaints. At the very least, however, it is apparent that such complaints were made sometime between the end of 2003 and the filing of plaintiff's Complaint. (*See* Pl.'s Opp'n (Docket No. 32) at 16.)

Assuming *arguendo* that the complaints at issue constitute protected activity, plaintiff has failed to establish a causal nexus between her complaints and any adverse action against plaintiff. A plaintiff may demonstrate the requisite causal nexus by showing "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." *McNair v. New York City Health & Hosp. Co.*, 160 F. Supp. 2d 601, 603 (S.D.N.Y. 2001) (citing *DeCintio*, 821 F.2d at 115).

The first hurdle to plaintiff's claims of retaliation lies in the dearth of evidence of any adverse action against her. In the context of a retaliation claim, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted); *see also Dauer v. Verizon Commc'ns Inc.*, No. 03 Civ. 05047, 2009 U.S. Dist. LEXIS 21506 (S.D.N.Y. Mar. 17, 2009) ("'[P]etty slights, minor annoyances, and simple lack of good manners' will not normally constitute adverse employment actions for purposes of a

---

[22] Plaintiff offers no evidence to support a finding that the alleged, unspecified complaints to Squillante concerned unlawful employment practices such that they might constitute protected activity.

retaliation claim." (citing *Burlington N.*, 548 U.S. at 68)). As discussed above in the context of plaintiff's disparate impact claim, plaintiff has offered facts to support only one instance of an adverse employment action taken against her—namely, the alleged failure to promote her to captain. This putative adverse action, however, cannot support a claim of retaliation because plaintiff has offered no evidence that any of the alleged protected activities (three EEO complaints in 2004 and unspecified oral complaints to Squillante) occurred prior to plaintiff's July 2003 decision to forego promotion.

Plaintiff's remaining suggestions of adverse action fail. The fact that plaintiff was unable to secure desired posts but was given the schedule she desired is the type of minor annoyance that courts find not to be an adverse action. *See, e.g.*, *Alers v. New York City Human Res. Admin.*, No. 06-Civ. 6131, 2008 U.S. Dist. LEXIS 72949, at *7 (E.D.N.Y. Sept. 24, 2008) (finding that plaintiff's "dissatisfaction with her duties," without more (such as a diminution in pay or loss of prestige), was an insufficient basis to find an employment action materially adverse); *Garber v. New York City Police Dep't*, No. 95-Civ.-2516, 1997 U.S. Dist. LEXIS 12590, at *7 (S.D.N.Y. Aug. 22, 1997) (holding that plaintiff's "dissatisfaction with [an employment action], standing alone, does not support his claim of an adverse employment action" in the retaliation context). Plaintiff's other claims, such as failure to train and denial of meal relief or compensatory time, are similarly inconsequential. Simply put, none of the allegedly adverse employment actions would "dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington Northern*, 548 U.S. at 57, a logical conclusion

supported by the highly pertinent fact that they did not dissuade plaintiff here from doing so. Plaintiff's failure to demonstrate an adverse action requires dismissal of plaintiff's claim of retaliation.

Furthermore, even if any of these actions could constitute adverse action, plaintiff has not shown the requisite causal connection between them and a protected activity. It is undisputed that plaintiff has not shown direct evidence of retaliatory animus, or that similarly situated employees who did not engage in protected activity were treated differently, because plaintiff has simply offered no concrete evidence as to how other similarly situated employees were treated. Accordingly, plaintiff can only proceed by establishing an inference of causation based on temporal proximity between her protected activity and the allegedly adverse actions. *See, e.g.*, *Butler v. Potter*, No. 06-CV-3828, 2009 U.S. Dist. LEXIS 24868, at *35–37 (E.D.N.Y. Mar. 26, 2009). The adverse employment actions to which plaintiff claims she was subjected, including denial of training, denial of meal relief or compensatory time, and denial of desired posts occurred sometime between June 2003 and the filing of plaintiff's Complaint. This Court, however, is unable to determine from the evidence before it precisely when most of the alleged events occurred, or in what sequence.[23] Even assuming that some of these allegedly adverse

---

[23] Defendants argue that all of the allegedly adverse actions occurred, or at least began, prior to any of the alleged protected activity. (*See* Defs.' Reply Mem. L. Supp. Mot. Summ. J. (Docket No. 35) at 7–8 (arguing, for example, that because plaintiff claims she was denied meal relief and post assignments "since 2003," the alleged adverse actions occurred prior to any protected activity).) If this were shown, it would constitute another reason to find no causal connection between plaintiff's putative protected activity and the allegedly adverse employment actions. *See, e.g.*, *Sundaram v. Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 583–84 (E.D.N.Y. 2006).

actions occurred close in time to some of the allegedly protected activity, this Court is not required to find a causal connection, especially where, as here, defendants have proffered legitimate, nondiscriminatory reasons for the actions in question, and plaintiff has not shown that these reasons were pretextual or that a retaliatory motive played some part in the allegedly adverse actions. *See, e.g., id.* at *37–39 (collecting cases); *see also id.* at *38–39 ("In sum, plaintiff offers nothing more than conclusory allegations . . . , with no basis in fact, that he was retaliated against[.] . . . Accordingly, even viewing the evidence most favorably to plaintiff, he cannot make out a *prima facie* case of retaliatory discrimination because there is no evidence to support a causal connection between the protected activity and the alleged retaliation, and summary judgment in defendant's favor is warranted."). Accordingly, plaintiff's claims of retaliation must be dismissed.

## IV. Hostile work environment standard

To make out a hostile work environment claim, a plaintiff must establish the following elements: (1) that her workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of her work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp*, 118 F.3d at 110. The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110 (quoting *Harris*, 510 U.S. at 22). In other words, the first element of a hostile work

environment claim requires allegations that demonstrate that the environment was *both* objectively and subjectively hostile and abusive. *See Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001).

To support a hostile work environment claim, however, a plaintiff "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986) (citations omitted). In evaluating plaintiff's claim, a court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (quoting *Harris*, 510 U.S. at 23). Whereas disparate treatment claims typically focus on discrete harms—such as hiring or termination—a hostile work environment claim requires analysis of the "workplace environment *as a whole*." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001); *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (determining hostile work environment requires an examination of the totality of the circumstances).

As set forth above, plaintiff has simply failed to offer any admissible evidence to support her claims of a hostile work environment. Moreover, even if plaintiff's speculative and conclusory allegations were credited, and the hearsay nature of the allegedly derogatory comments ignored, in considering the work environment as a whole and taking the facts in the

30

light most favorable to plaintiff, this Court cannot conclude that plaintiff has offered sufficient evidence that a reasonable jury could find that she was subjected to a hostile work environment. The infrequent and relatively innocuous comments alleged by plaintiff do not rise to the level of "objectively hostile," especially where most of the alleged statements were not made to plaintiff or in her presence. Furthermore, the most troubling comments identified by plaintiff were allegedly made by defendant Morgello, who was the same rank as plaintiff, and may not be imputed to DOC or the City unless they were made aware or had reason to know of the comments and failed to take appropriate corrective action. *See, e.g., Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997). Plaintiff concedes that Warden Squillante never made any of the allegedly discriminatory or hostile comments she complains about, and she has failed to provide admissible evidence to support her allegations as to other comments allegedly made by defendants Knight and Moses.[24] For these reasons, plaintiff's claims of a hostile work environment must be dismissed.

## V.   *Monell* claims

Plaintiff also contends that the City is liable pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). Although a municipality will not be liable under § 1983 for simply employing a tortfeasor, *id.* at 691 ("a municipality cannot be liable under § 1983 on a *respondeat*

---

[24] Plaintiff alleged that Deputy Warden Knight had discriminated against her by denying her positions in his area in favor of "black Caribbeans," and that Captain Moses had discriminated against her by denying her positions in EHO in favor of male CO's. Plaintiff's claims against these defendants are based on vague and conclusory allegations and hearsay evidence (specifically statements supposedly conveyed to her by Squillante). (*See* Pl.'s Opp'n (Docket No. 32) at 7.)

*superior* theory"), it can be liable for violations of federally protected rights ascribable to its own

wrongs. A municipality will be liable if the deprivation of a right can be attributed to the

enforcement of a municipal policy or practice. *Id.* at 690. The deprivation need not result from

an official policy, *Villante v. Dep't of Corrs.*, 786 F.2d 516, 519 (2d Cir. 1996), and a

municipality may be liable for a deprivation "visited pursuant to a governmental 'custom' even

though such custom has not received formal approval through the body's official decisionmaking

channels." *Monell*, 436 U.S. at 691. "So long as the discriminatory practices of city officials are

persistent and widespread, they 'could be so permanent and well settled as to constitute a custom

or usage with the force of law,' and thereby generate municipal liability." *Sorlucco v. New York

City Police Dep't.*, 971 F.2d 864, 870–71 (2d Cir. 1992) (quoting *Monell*, 436 U.S. at 691).

    In order to establish *Monell* liability, a plaintiff must establish the existence of a

municipal policy or custom, as well as a causal connection between the policy/custom and the

alleged civil rights violation. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). The

plaintiff in a § 1983 case bears the burden of establishing municipal liability, *id.*, and may not

rely on conclusory allegations that the municipality has a particular custom or policy that may

give rise to municipal liability. *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992).

    Here, plaintiff has failed to establish the violation of any protected rights. She has also

failed to demonstrate the existence of any municipal policy or custom that might have led to a

violation of her rights. Her conclusory and speculative allegations fail to meet the threshold

required to survive summary judgment, and so her claims against the City of New York pursuant to *Monell* are hereby dismissed.

Similarly, plaintiff has failed to demonstrate that any of the individual defendants deprived her of any protected right, and her claims against the individual defendants must also be dismissed. Because this Court finds that plaintiff failed to demonstrate any violation of her rights, it need not reach the issue of qualified immunity. Nevertheless, plaintiff's failure to demonstrate such a violation is also grounds to find that the individual defendants are entitled to qualified immunity on plaintiff's § 1983 claims against them. *See, e.g., Demoret*, 451 F.3d at 148 ("In deciding whether qualified immunity applies, the threshold inquiry is whether the plaintiff's version of the facts 'show[s] the [defendant's] conduct violated a constitutional right.' If no constitutional or statutory right was violated – construing the facts in favor of plaintiff[] – we need not conduct further inquiries concerning qualified immunity." (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (first alteration in original)). Therefore, plaintiff's claims against the individual defendants must also be dismissed because the individual defendants are entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the Court finds that defendants are entitled to summary judgment on all of plaintiff's claims. This matter is hereby DISMISSED. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2009

_____
ROSLYNN R. MAUSKOPF
United States District Judge